UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                           :

JASON DENNY, Individually and On Behalf of All    :
Others Similarly Situated,

                                         :

                      Plaintiff,         :            21 Civ. 3299 (JPC)

                                         :

          -v-                        :         <u>OPINION AND ORDER</u>

                                         :

CANAAN INC., NANGENG ZHANG, and        :
TONG HE,

                                         :

                    Defendants.      :

                                         :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Lead Plaintiffs Bill Lu and Liying Huang allege that Defendants Canaan, Inc. ("Canaan"),

Nangeng Zhang ("Mr. Zhang"), and Tong He ("Mr. He") made knowingly false and misleading

statements in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R.

§ 240.10b-5, and in violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Defendants

have moved to dismiss the Amended Complaint, arguing that it fails to adequately plead a

substantive Section 10(b) violation because Lead Plaintiffs have not alleged that Defendants made

materially false or misleading statements or that they did so with the requisite scienter.  Because

the Court determines that one of Defendants' alleged misstatements was outside of the class period

and inactionable, another was not materially false or misleading, and the third was not made with

the requisite scienter, the Court grants Defendants' motion in its entirety.

## I.  Background

**A.    Facts**[1]

This case arises out of the proposed class's purchases of American Depositary Shares ("ADSs") of Canaan between February 10, 2021 and April 9, 2021 (the "Class Period").  Am. Compl. ¶ 1.  Canaan is a Cayman Islands corporation that primarily manufactures and sells cryptocurrency mining equipment.  *Id.* ¶¶ 16, 23.  In 2018, 2019, and 2020, sales of this equipment comprised 99.7%, 97.7% and 94.4% respectively of Canaan's total revenue.  *Id.* ¶ 27.  Canaan's ADSs are publicly traded on the Nasdaq.  *Id.*  ¶ 2.  Mr. Zhang is the founder of Canaan, and has served as its CEO and as Chairman of its Board of Directors since that founding.  *Id.* ¶ 18.  Mr. He has served as Canaan's Director of Finance since July 2020 and served as its acting CFO from February 2021 to August 2021.  *Id.* ¶ 19.  Lead Plaintiffs allege that both Mr. Zhang and Mr. He "because of their positions within [Canaan] possessed the power and authority to control the contents of Canaan's SEC filings, press releases, and other market communications."  *Id.* ¶ 21.  Lead Plaintiffs further allege that Mr. Zhang and Mr. He "were provided with copies of the Company's SEC filings and press releases . . . prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected."  *Id.*

On November 30, 2020, Canaan issued a press release attached as Exhibit 99.1 to a Form 6-K filed with the SEC, which was titled "Canaan Inc. Reports Unaudited Third Quarter 2020 Financial Results" and announced Canaan's financial results for the quarter ending September 30,

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 65 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation marks omitted)).

2020. *Id.* ¶ 28; *see* Dkt. 71-2 at 2-12 ("11/30/20 Press Release").  This press release reported a 20.7% decrease in total computing power sales from the same period in 2019 and a 13.4% quarter-over-quarter increase in such sales compared to the second quarter of 2020, as well as a 75.7% year-over-year revenue decrease and 8.5% quarter-over-quarter revenue decrease.  11/30/20 Press Release at 1.  The press release contained quotations from both Mr. Zhang, as the Chairman and CEO of Canaan, and Quanfu Hong ("Mr. Hong"), then the CFO of Canaan.  Mr. Hong mentioned, among other things, the rebounding market demand for Bitcoin mining machines and pre-sale orders that Canaan had received:  "[T]he demand for mining machines in the market continued to rebound during the third quarter, and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020."  *Id.* at 2.

Mr. Hong resigned as CFO effective immediately for "personal reasons" on February 9, 2021.  Am. Compl. ¶ 30.  The next day, which is the start of the Class Period, Canaan issued a press release again attached as Exhibit 99.1 to a Form 6-K filed with the SEC and signed by Mr. Zhang, which was titled "Canaan Announces Improved Revenue Visibility in 2021."  *Id.* ¶ 32; *see* Dkt. 71-3 at 104-06 ("2/10/21 Press Release").  Lead Plaintiffs rely on multiple statements made in the February 10, 2021 press release that touted the company's increased revenue visibility thanks to purchase orders for Bitcoin mining machines.  The release stated:

> Canaan . . . announced that its revenue visibility has improved substantially in 2021 as a result of attaining purchase orders totaling more than 100,000 units of bitcoin mining machines from customers in North America.  Many of those purchase orders were placed with prepayment and will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond.

2/10/21 Press Release at 1.  It further stated that "[w]ith those fully committed purchase orders, the Company now enjoys a much higher degree of revenue visibility and more precise forecast.  As such the Company is able to leverage such information and additional liquidity to conduct its

component purchases, production scheduling, warehousing and logistics." *Id.* The press release quoted Mr. Zhang as saying:

> In late 2020, we shifted our client base to mostly publicly traded companies and bitcoin-focused investment funds which tend to place sizable orders with longer-term commitment. As a result, we can now forecast our revenue much more precisely. Our increased revenue visibility is not only enabling us to plan our production and logistics well in advance, but also helping us to optimize our cost structure and improve our customer satisfaction rate. Above all, it should help us achieve profitable growth for the long run.

*Id.*

On Monday, February 8, 2021, two days before this press release was issued, Canaan's ADSs opened trading at $6.91 each. Am. Compl. ¶ 33. The shares closed trading on Friday, February 12, 2021, at $13.04 each. *Id.*

On April 9, 2021, a magazine called *Decrypt* published an interview with Mr. Zhang in an article titled, "Canaan CEO Is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months." *Id.* ¶ 36; Dkt. 71-3 ("*Decrypt* Article") at 1. The article began: "Canaan founder and CEO Nangeng Zhang has reason to be chipper. His Beijing-based company is reporting earnings on Monday, when it will disclose Q4 and full 2020 results, and the outlook is rosy." Decrypt Article at 2. The article attributed several statements to Mr. Zhang.[2] Mr. Zhang was quoted as saying that "Canaan has secured a large number of pre-sale orders for its mining machines," and that "as institutional interest in Bitcoin continues to strengthen, so will the entry of more actors into Bitcoin mining." *Id.* The article described Canaan as "one of the world's largest manufacturers of mining hardware," and observed that "[a]ll [presumably referring to manufacturers of mining hardware] have seen demand for their products soar in recent months." *Id.* The article reported that "Canaan

---

[2] The *Decrypt* article contained numerous direct quotes from Mr. Zhang, while also paraphrasing other statements that are attributed to him. For clarity purposes, the Court specifically notes when reciting a reported direct quote from Mr. Zhang.

anticipates it will have no problem fulfilling its bulging order book," but did not attribute that anticipation to Mr. Zhang.  *Id.* at 4.  The article proceeded to paraphrase Mr. Zhang as saying "that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors—which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining."  *Id.*  Mr. Zhang then was quoted:  "Our approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks."  *Id.*  He further was quoted:  "We have been able to successfully secure an entire year's worth of orders for 2021, with orders for our Avalon A1246 miners scheduled till March 2022."  *Id.*  Mr. Zhang also was quoted to say that Canaan's operation of its own mining business "will significantly strengthen our inventory management capabilities, stabilize our supply chain networks, and diversify our revenue stream, allowing us to better optimize our mining hardware during the lull seasons (where demand for mining machines tends to be weaker)."  *Id.*

Then, on the morning of April 12, 2021, Canaan issued a press release regarding its fourth quarter and year end 2020 financial results attached as Exhibit 99.1 to a Form 6-K filed with the SEC and titled "Canaan Inc. Reports Unaudited Fourth Quarter and Full Year 2020 Financial Results."  Am. Compl. ¶ 39; *see* Dkt. 71-3 at 141-53 ("4/12/21 Press Release").  That press release revealed a total computing power sales decrease of 93.1% both year-over-year and quarter-over-quarter, as well as a 91.75% decrease in revenue year-over-year and a 76.56% decrease in revenue quarter-over-quarter.  4/12/21 Press Release at 1.  Other financial results for the quarter and year were similarly poor.  *Id.*  The release quoted Mr. Zhang as saying, among other things:

> Although the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders, with

> US$66 million of cash advance from customers as of December 31, 2020, thus
> laying a solid foundation for solid revenue growth in 2021.

*Id.* at 2.  Additionally, Mr. He was quoted as saying, among other things:  "Due to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high-quality mining machines both in and outside of China."  *Id.*

That same morning, Canaan discussed its fourth quarter and 2020 year end financial results on an earnings conference call.  Am. Compl. ¶ 40; *see* Dkt. 71-3 at 166-82 ("4/12/21 Call Tr.").  On that call Mr. Zhang stated through a translator that Canaan "saw a severe supply shortage in the industry" related to "chip supply" during the fourth quarter of 2020 and into 2021.  4/12/21 Call Tr. at 10.  He added that he "[could not] really disclose the exact number of chips that [Canaan had] under production right now" but that the "strategies [Canaan had] adopted to address this problem" had "helped [Canaan] achieve outstanding results in terms of keeping up" and that Canaan "can effectively secure the delivery of our chips from our foundry partners."  *Id.*  He also stated that "since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price.  And the prices were actually lower than our existing machines."  *Id.* at 13; *accord* Am. Compl. ¶ 40.  While Canaan ADSs closed on Friday, April 9, 2021, at $18.67 per share, they closed on Monday, April 12, 2021, following the press release and earnings call, at $13.14 per share, with trading volume "more than three times the average daily volume over the preceding ten trading days."  Am. Compl. ¶ 41.

## B.    Procedural History

Plaintiff Jason Denny filed the original Complaint in this action on April 15, 2021.  Dkt. 1.  On December 9, 2021, the Court granted Lu and Huang's motion for appointment as Lead Plaintiffs, and approved their selection of lead counsel.  Dkt. 62.  Lead Plaintiffs filed their Amended Complaint on February 7, 2022.  Dkt. 65.  Lead Plaintiffs allege that Defendants

committed violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (Count I), Am. Compl. ¶¶ 70-81, and that Mr. He and Mr. Zhang violated Section 20(a) of the Exchange Act (Count II), *id.* ¶¶ 82-87.

Defendants filed a motion to dismiss on April 8, 2022, Dkts. 69, 70 ("Motion"), accompanied by a motion requesting that the Court take judicial notice of certain materials, Dkt. 71. Defendants argue that the Amended Complaint should be dismissed because Lead Plaintiffs fail to plead falsity or scienter with respect to alleged violations of Section 10(b) and Rule 10b-5.[3] *See* Motion at 8-20. Lead Plaintiffs filed their response to both motions on June 7, 2022. Dkts. 72 ("Opposition"), 73. Defendants filed their reply in further support of their motion to dismiss on July 7, 2022. Dkt. 74 ("Reply").

## II. Standard of Review

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*,

---

[3] Defendants seek dismissal of the entire Amended Complaint, though their arguments address only the violations of Section 10(b) and Rule 10b-5 alleged in Count One. *See generally* Motion. However, because "[t]o establish liability under section 20(a), a plaintiff 'must first establish a primary violation,'" *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 169 (S.D.N.Y. 2018) (quoting *In re Omnicom*, 597 F.3d 501, 514 n.6 (2d Cir. 2010)), dismissal of Count I would require dismissal of Count II.

807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b) in order to survive a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). A complaint making fraud allegations under Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Diesenhouse v. Social Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Allegations that are conclusory or unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99; *see also Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

Securities fraud claims must also satisfy the Private Securities Litigation Reform Act ("PSLRA")'s heightened pleading requirements. *Diesenhouse*, 2022 WL 3100562, at *5. The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Diesenhouse*, 2022 WL 3100562, at *5. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues Rights, Ltd.*, 551 U.S. 308, 323 (2007). For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### III. Discussion

#### A.   Judicial Notice

As part of their motion to dismiss, Defendants have filed a motion requesting that the Court take judicial notice of certain materials, which are identified in the motion as Exhibits 1 through 9. Dkt. 71. Lead Plaintiffs have opposed this motion in part. Dkt. 73. Lead Plaintiffs do not oppose the Court taking judicial notice of Exhibits 1, 4, 6, 7, and 9, *id.* at 2, each of which is a document incorporated into the Amended Complaint by reference.[4] The Court therefore grants the motion with respect to those materials. With respect to the remaining materials, the Court need not determine whether to take judicial notice of them in resolving Defendants' motion to dismiss. The Court therefore declines to take judicial notice of Exhibits 2, 3, 5, and 8.[5]

---

[4] These materials consist of the November 30, 2020, February 10, 2021, and April 12, 2021 press releases, the *Decrypt* article, and the transcript of the April 12, 2021 earnings call. Dkt. 71 at 1-3.

[5] These materials consist of, respectively, Canaan's Form F-1 Registration Statement filed with the SEC on October 28, 2019, Canaan's ADS historical stock data, Bitcoin's historical price data, and Canaan's Form 6-K reporting financial results from the first quarter of 2021 filed with

**B.      Section 10(b) and Rule 10b-5 Claims**

Count I alleges that Defendants "carried out a plan, scheme, and course of conduct" that violated Section 10(b) and Rule 10b-5 by deceiving investors, inflating and maintaining prices of the Canaan ADSs, and causing proposed class members to purchase ADSs at inflated prices.  Am. Compl.  ¶¶ 71-72.  To state a claim under Section 10(b), "a complaint must adequately plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *In re DraftKings Inc. Sec. Litig.*, No. 21 Civ. 5739 (PAE), 2023 WL 145591, at *15 (S.D.N.Y. Jan. 10, 2023) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).  Defendants contend that Plaintiffs fail to allege a materially false or misleading statement, Motion at 8-17, and fail to plead any facts permitting an inference of scienter, *id.* at 17-20.

**1.      Misstatements or Omissions of Material Fact**

Lead Plaintiffs allege three occasions when Defendants made "made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading," Am. Compl. ¶ 73:  (1) the November 30, 2020 press release, *id.* ¶ 28, (2) the February 10, 2021 press release, *id.* ¶ 32, and (3) the April 9, 2021 *Decrypt* article reporting an interview with Mr. Zhang, *id.* ¶ 36.  Defendants argue that the Amended Complaint fails to adequately plead for any of those occasions a material representation that was false when made or the omission of material information that Defendants had a duty to disclose.  Motion at 8.   The Court will analyze the challenged statements chronologically.

---

the SEC on June 1, 2021.  Dkt. 71 at 1-3.

i.      **The November 30, 2020 Press Release**

The first challenged statements come from Mr. Zhang's and Mr. Hong's quotes in the November 30, 2020 press release. Mr. Zhang stated, among other things: "With new generations of mining machines and AI chips in the pipeline, we are confident that the enhanced performance of our new products will continue to bolster our competitive advantages and solidify our market leadership going forward." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Mr. Hong, in turn, stated that "the demand for mining machines in the market continued to rebound during the third quarter [of 2020], and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Defendants argue that, as a threshold matter, these statements are not actionable because they occurred prior to the Class Period, which began on February 10, 2021. Motion at 9. Lead Plaintiffs respond that these statements "misled the market" and Defendants had a "duty to correct and a duty to update" the statements, thus rendering the November 30, 2020 statements actionable. Opposition at 14 & n.7.

In the Second Circuit, a duty to update a past statement "may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 632 (2d Cir 2019) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)). "There is, however, no duty to update vague statements of optimism or expressions of opinion, statements that are not material, or statements that are not forward looking and do not contain some factual representation that remains alive in the minds of investors as a continuing representation." *Id.* (internal quotation marks and brackets omitted)). On the other hand, a duty to correct "applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed

by subsequently discovered information actually was not." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 109 (internal quotation marks omitted).

While generally a defendant is liable "only for those statements made during the class period," *id.* at 107, courts have suggested that liability may arise for earlier made statements if the duty to update or correct them subsequently arose during the class period, *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) ("The August 3, 2007 statements regarding RBS's exposure were made prior to the start of the Class Period and cannot be the basis of liability unless there was a duty to update or correct them."); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007) (holding that a misstatement created by the duty to correct a statement made outside the class period "was made (if at all) when a duty to correct arose"); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("The Second Circuit has held that 'the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period.'" (quoting *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016))).

Lead Plaintiffs argue that Mr. Hong's statement in the November 30, 2020 release that "demand for mining machines in the market continued to rebound during the third quarter, and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020," 11/30/20 Press Release at 2, "later bec[a]me misleading during the Class Period when Defendants learned that the increasing bitcoin market made those pre-sale orders a detriment rather than something positive." Opposition at 14 n.7. They further argue that Mr. Zhang's statement that a new generation of mining machines would bolster the company's competitive advantage, 11/30/20 Press Release at 2, was "subject to a duty to update because although reasonable to believe at the time . . . , once the bitcoin market price rose, due to the fact

that [the] Company's mining machines were sold on prepayment, the Company was not at a competitive advantage, but a disadvantage." Opposition at 14 n.7.

As alleged, these statements were made prior to the Class Period. Yet the Amended Complaint fails to plead facts to establish that any duty to update or correct them subsequently arose within the Class Period. The Amended Complaint contains no allegation of knowledge giving rise to such a duty that was gained by Defendants during the Class Period.[6] Rather, the Amended Complaint is vague as to when exactly Defendants supposedly understood that rising Bitcoin prices would reduce the benefits of pre-selling mining machines in late 2020. Without any allegations stating that, or how, Defendants reached such an understanding during the Class Period, these November 30, 2020 statements are not actionable.[7]

### ii. The February 10, 2021 Press Release

Canaan issued a press release on February 10, 2021 titled "Canaan Announces Improved Revenue Visibility in 2021." 2/10/21 Press Release. The challenged statements in this release include Canaan's assertion that revenue visibility had improved due to prepaid purchase orders

---

[6] If anything, the allegations in the Amended Complaint suggest that Defendants gained knowledge of the allegedly misleading nature of the November 30, 2020 statements prior to the commencement of the Class Period. For instance, Lead Plaintiffs contend that Defendants had a duty to update or correct the quotation from Canaan's CFO, Mr. Hong, in the November 30, 2020 press release. Yet, the Amended Complaint's scienter allegations specifically refer to Mr. Hong's resignation *the day before the Class Period* as supporting an inference of scienter with respect to the February 10, 2021 press release. Am. Compl. ¶ 48. Moreover, any theory that knowledge giving rise to a duty to update or correct with respect to the November 30, 2020 statements was first gained after the Class Period began on February 10, 2021 would seem in tension with Lead Plaintiffs' claim that statements in the February 10, 2021 press release were misleading due to an omission at the time they were made, which naturally would entail having the requisite knowledge at some point *before* filing the Form 6-K with the attached press release on February 10, 2021. *See id.* ¶ 32; Opposition at 14-15.

[7] As discussed at *infra* III.C, Lead Plaintiffs' allegations on this point are insufficient to establish scienter given the heightened pleading requirements, as they fail to allege with the requisite specificity that and how Defendants understood the impact of rising Bitcoin prices during the Class Period.

that "will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond."  *Id.* at 1; *see* Am. Compl. ¶ 32.  The press release added a quote from Mr. Zhang, saying that the increased revenue visibility was attributable to a late 2020 shift in Canaan's "client base to mostly publicly traded companies and bitcoin-focused investment funds."  2/10/21 Press Release at 1.

Defendants argue first that no statement in the February 10, 2021 press release was untrue, Motion at 11, and second that the Amended Complaint fails to plead a valid omissions theory because there is not a sufficiently close nexus between the statements that were made and the additional statements that Lead Plaintiffs claim had to be made to render the press release not misleading, *id.* at 11-14.  Lead Plaintiffs appear to cede that they are proceeding only on an omissions theory:  they respond that "each of the above statements was materially false and misleading, omitting . . . that the pre-sale prepayment orders actually harmed Canaan's financial outcome for the fourth quarter of 2020," and they point to Canaan's April 12, 2021 statement that "most of the mining machines were sold as future contracts, which had a fixed price . . . actually lower than our existing machines."  Opposition at 15 (quoting Am. Compl. ¶¶ 38-40).  Further, Lead Plaintiffs claim that Defendants' omission of the true effect of the pre-payment orders "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," *id.* (quoting *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005)), particularly when it came to how the company had performed in the fourth quarter of 2020.  That matters, Lead Plaintiffs reason, because Canaan's performance in the fourth quarter of 2020 was in fact harmed by the pre-sales of mining machines, yet the release trumpeted those pre-sales only as something positive for the company.  *Id.*; *see* Am. Compl. ¶ 38(b), (c) (alleging that Defendants concealed from the investing public that "the Company's touted pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third

and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020" and that as a result, "Canaan's fourth quarter 2020 sales and sales revenue had declined dramatically").

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44. "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman v. Elan Corp.*, 706 F.3d 145, 152-53 (2d Cir. 2013) (ellipsis omitted) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)).  Instead, absent an independent duty to speak, disclosure is required "only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting *Matrixx Initiatives*, 563 U.S. at 44). "[W]hether a statement is misleading depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) (internal quotation marks omitted).  So, with respect to omissions "the court must determine whether the omitted fact would have been material to a reasonable investor – *i.e.* whether 'there is a substantial likelihood that a reasonable investor would consider it important.'"  *Id.* at 196 (brackets omitted) (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)).  And in particular "a duty [to disclose omitted facts] may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted).  Part of that analysis requires a court to examine the relatedness of the statement actually made and the facts which were omitted. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[To prevail on [an omission theory], plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there is a "a duty to

disclose the omitted information . . . in order to prevent the statement from being materially misleading.").

Here, Defendants argue that, because the press release concerned "only . . . then-existing facts and projections about how those facts would affect Canaan's future performance," no reasonable investor would conclude that those statements had anything to do with performance in the fourth quarter, which had recently passed.  Motion at 12-13 (emphasis omitted).  Moreover, Defendants argue that Canaan's "statements about prepaid purchase orders were made in the context of how they would provide enhanced 'revenue visibility' in 2021; they were not about how pre-sales would impact fourth-quarter 2020 results."  *Id.* at 13-14.  And Defendants rely heavily on *In re Ferroglobe PLC Securities Litigation*, where the court held that statements which were "expressly directed to the future" could not be viewed by a reasonable investor as related to negative performance in the past quarter.  No. 19 Civ. 2368 (RA), 2020 WL 6585715, at *8 (S.D.N.Y. Nov. 10, 2020).

Lead Plaintiffs argue that, unlike the statements in *Ferroglobe*, the statements in the February 10, 2021 press release were not solely forward-looking.  The Court agrees.  The Amended Complaint alleges that the omission of information in the February 10, 2021 press release—the below market prepaid prices of the mining machines sold, and the negative effect those pre-sales would have on revenue in the fourth quarter of 2020—render the statements in that release misleading to a reasonable investor.  Am. Compl. ¶¶ 31-35, 38; *see id.* ¶ 33 ("The press release concealed the fourth quarter's known dismal financial performance, while promoting Canaan's expected future success.").  The press release quoted Mr. Zhang as explaining that the prepaid purchase orders resulted from a "late 2020" shift[8] in Canaan's "client base to mostly publicly

---

[8] Drawing all inferences in favor of Lead Plaintiffs, the Court assumes that an order made with "prepayment" in the fourth quarter of 2020 would have meant collecting the revenue associated with that order in the fourth quarter.

traded companies and bitcoin investment funds which tend to place sizable orders with longer-term commitment."  2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32.  Mr. Zhang continued that "as a result [of that shift] we can now forecast our revenue much more precisely" which increased revenue visibility "should help us achieve profitable growth for the long run."  2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32.

In other words, as alleged, Mr. Zhang explained that it was the shift in client base in "late 2020," so presumably in the fourth and perhaps third quarters of 2020,[9] which created the prepaid purchase orders that Defendants touted for increasing revenue visibility, yet the release omitted that the same late 2020 shift in the client base—and its associated increase in locked-in prepaid orders—led to significantly reduced revenue in the previous quarter.  *Id.* ¶ 38.  This decrease in revenue occurred, Lead Plaintiffs allege, because the "pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020."  *Id.* ¶ 38(b).  The fact that the same business practice that was lauded in the release caused both the forward-looking revenue visibility optimism and allegedly contributed significantly to the past revenue performance gloom is what creates a sufficiently close relationship between the two to require disclosure of the latter in order to render the former not misleading to a reasonable investor.  Or put differently, both the future revenue visibility and the past lost revenue opportunities were significant effects of the same cause, just felt in different quarters.  A reasonable investor learning of the touted positive effect on the future would find material the negative effect on the present.

---

[9] This inference is strengthened by the fact that the November 30, 2020 press release referenced increase pre-sales beginning in the third quarter of 2020 and continuing into the fourth quarter.  11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28

Nor does this determination require the Court to adopt some legally novel "freestanding completeness requirement" as Defendants argue.  Motion at 13.  Indeed, the fact allegedly omitted by Defendants was later acknowledged by Defendants themselves during the April 12, 2021 earnings call as contributing to the fourth quarter of 2020 financial results.  Am. Compl. ¶ 40; *see* Dkt. 4/12/21 Call Tr. at 13 (Mr Zhang: "[T]he price of mining machines actually moves with the Bitcoin prices only for the mining machines that are ready for delivery.  So, since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price.  And the prices were actually lower than our existing machines.").  In other words, as alleged, in the February 10, 2021 press release, Defendants voluntarily touted the positive future effects of a business decision, yet hid the significant negative effects of that very same decision.  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (holding that when the defendant spoke regarding rental payments made by a large lessee, it put those payments "in play" and therefore had a duty to disclose that the lessee was only able to make rental payments because of a loan provided by the defendant).  While it is certainly conceivable that the negative effect on past revenue created by a shift to pre-orders could be small enough that a reasonable investor would not find it important, that is not what is alleged here.

Of course, corporate officials are only responsible for "revealing those material facts reasonably available to them. . . .  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citations omitted).  But Defendants do not argue that a lack of knowledge on their part defeats the alleged duty to disclose an omitted fact

here.  For that reason, the Court treats the question of whether Defendants knew the impact that the mining machine pre-sales would have on fourth quarter revenue at the time they issued the February 10, 2021 press release only when addressing scienter at *infra* III.C.

### iii.     The April 9, 2021 *Decrypt* Article

The Court next turns to the April 9, 2021 *Decrypt* article, which was titled "Canaan CEO is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months."  *Decrypt* Article; *see* Am. Compl. ¶ 36.  The article reported that "Zhang said that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors" and directly quoted Mr. Zhang as saying that the company's approach is "one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks."  *Decrypt* Article at 4.  Lead Plaintiffs allege that these statements "concealed from the investing public" that "Canaan had experienced significant ongoing supply chain disruptions during the fourth quarter 2020."  Am. Compl. ¶ 38(a).  Lead Plaintiffs further contend that during the April 12, 2021 earnings call, "Defendants reported the exact opposite [of what Mr. Zhang said during the *Decrypt* interview], that Cannon had experienced a 'severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020."  Opposition at 9 (quoting Am. Compl. ¶ 40).  Defendants argue that Lead Plaintiffs' claim based on the *Decrypt* article fails first because many statements within the article were not made by Canaan, but by an independent reporter, Motion at 14-16, and second because Mr. Zhang's statement that the company was working with leading chip manufacturers to reduce supply chain risks was not false or misleading, *id.* at 16-17.

First, there is of course no general rule that statements made to the media cannot form the basis for securities fraud claims.  *See e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 662-64 (S.D.N.Y. 2017).  But courts in this District have dismissed claims arising from

statements in the press that "are not reasonably attributable to defendants and accordingly do not give rise to liability under the federal securities laws." *Hershfang v. Citicorp.*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991). In *Hershfang*, for instance, the court determined that statements attributed to a defendant's "spokesman" in various news articles were insufficiently attributed to the defendant under Rule 9(b) to state a claim,[10] and then turned to other portions of those articles which were "attributed to specific defendants" and determined that they too were not actionable because they contained only statements of opinion. *Id.* at 1256.

On the other hand, when a pleading sufficiently alleges that a statement in an article is attributable to a defendant, the statement may be treated as being made by that defendant. In *In re Columbia Securities Litigation*, the court determined that at the motion to dismiss stage, a statement in a *Forbes* article could serve as the basis for a fraud claims "[i]f, as plaintiffs allege, [one of the defendants] made a false statement to the *Forbes* reporter," because "[w]hile defendants certainly had less than complete control over what the reporter wrote, they did have control over what [that defendant] said." 747 F. Supp. 237, 245 (S.D.N.Y. 1990); *see also Banco Bradesco*, 277 F. Supp. 3d at 663 (determining that a corporate defendant could be liable for statement made to the press by an unidentified spokesperson).

Thus, the quote from Mr. Zhang in the *Decrypt* article that the company's approach "is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks," *Decrypt* Article at 4, clearly may be attributed to him. Further, at this stage, where all reasonable inferences must be drawn in favor of Lead Plaintiffs, the Court determines that the content of Zhang's statement, as reported in the article, "that the

---

[10] The court in *Banco Bradesco* arguably took a different approach on this issue, rejecting an argument that a claim based on statement in an article attributed to an unidentified representative of a corporate defendant should be dismissed on the basis that it was not attributed to a specific individual. 277 F. Supp. 3d at 663.

company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors—which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining," *id.*, may be attributed to him as well, even though it was not a direct quote. The *Decrypt* article consists substantially of an interview with Mr. Zhang, and contains multiple direct quotes and multiple paraphrases of statements made by Mr. Zhang.  The statement begins with "Zhang said," *id.*, and the Amended Complaint alleges that Mr. Zhang made this statement, Am. Compl. ¶ 37.[11]  To hold that this statement could not be attributed to Mr. Zhang in such conditions would be to determine that only words within direct quotes in press articles could be attributed to securities fraud defendants, a proposition which is unsupported by any caselaw cited by Defendants and which the Court declines to endorse.[12]

The Court therefore turns to Defendants' argument that Mr. Zhang's statements in the *Decrypt* article were not false or misleading.  Motion at 16; Reply at 5-6.  As stated, the Amended Complaint relies on two statements in the *Decrypt* article attributable to Mr. Zhang: (1) "Zhang said that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors," and (2) a quote from Mr. Zhang saying that "[o]ur approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks."  Am. Compl. ¶ 37 (emphasis omitted); *see Decrypt* Article at 4.  Lead Plaintiffs allege that these statements were false because "Canaan had

---

[11] Lead Plaintiffs do not appear to argue, and the Court does not hold, that the opening of the article, which included a statement that the "outlook is rosy" referring to the fourth quarter and full year 2020 results, is attributable to Defendants.  Opposition at 9-10, 13.  There is of course significantly more reason to doubt that such a claim, found only in the article's introduction, prior to any direct reference to statements made by Mr. Zhang and without any direct attribution to any Defendant, could be considered a statement by Defendants.

[12] Such a rigid rule would also open avenues for fraud by making it possible for entities and insiders to make statements in the press without fear of liability so long as they secured a reporter's agreement not to put their words in quotes.

experienced significant ongoing supply chain disruptions during the fourth quarter 2020." Am. Compl. ¶ 38.

To support this claim, Lead Plaintiffs point to statements made in Canaan's fourth quarter and year end 2020 financial results released on April 12, 2021, *id.* ¶ 39, as well as statements made by Mr. Zhang during the earnings call that day discussing those results, *id.* In particular, the press release announcing the financial results contained a statement by Mr. Zhang that "[a]lthough the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders," and a statement by Mr. He that "[d]ue to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high quality mining machines both in and outside of China." 4/12/21 Press Release at 2; *see* Am. Compl. ¶ 39. And on the earnings call, Lead Plaintiffs allege that "Zhang stated that Canaan experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Am. Compl. ¶ 40. A review of the full transcript of that call, however, shows that he made a different statement. Mr. Zhang said, through a translator:

> Due to the low Bitcoin prices in the second half of 2020, most mining machine manufacturers reduced their investment in fabrication during the period. As a result, when the Bitcoin price bounced back in the second half of 2020, we *saw a severe supply shortage in the industry*. In addition [] the limited supplies across the semiconductor manufacturing sector recently also ha[ve] played a role in building the shortage of chips in 2021, further accelerating the problem of chip supply.
>
> We cannot really disclose the exact number of chips that we have under production right now. But one of the strategies we've adopted to address this problem is to maintain our partnerships with multiple foundry partners and keep expanding our collaborations, *which has helped us achieve outstanding results in terms of keeping up*.

4/12/21 Call Tr. at 10 (emphasis added).[13]

---

[13] "It is well established that 'where the plaintiffs['] allegations are contradicted by a document that the complaint incorporates by reference, the document controls.'" *Optionality*

Lead Plaintiffs argue that Defendants' statements "regarding securing chips [in advance of the worldwide shortage of processors' was an outright falsehood as Defendants' own admissions, just three days later, prove," because "Defendants reported the exact opposite, that Canaan had experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020."  Opposition at 9. They argue further that "even if Canaan had secured chips prior to the shortage, the statement gives the false impression that the Company was not affected by the shortage," effectively omitting material information.  *Id.* at 9-10.

The flaw in Lead Plaintiffs' argument is that they have failed to adequately allege the true state of the world which could make either a false statement false or an omission an omission.  In order to establish an outright misrepresentation, Lead Plaintiffs would need to allege either that Canaan had not "secured chips from a number of fabrication plants in advance of the worldwide shortage of chips" or that Canaan had not "reduce[d] supply-chain risks."  But in support of those facts, Lead Plaintiffs point only to statements from April 12, 2021 that refer either to general supply chain disruptions without reference to chips, or to industry-wide disruptions to chips without mention of whether or to what extent those disruptions impacted Canaan in particular.  To this end, it is significant to note Lead Plaintiffs' misstatement in the Amended Complaint of what Mr. Zhang said during the earnings call.  They allege that "defendant Zhang stated that *Canaan* experienced 'a severe supply shortage,'" Am. Compl. ¶ 40 (emphasis added), whereas in fact Mr. Zhang stated that "we saw a severe supply shortage *in the industry*," Dkt. 71-3 at 175 (emphasis added).  Neither the severity, nor even the existence, of the shortage as applied to Canaan is indicated by that

---

*Consulting Pte. Ltd. v. Nekos*, No. 18 Civ. 5393 (ALC), 2019 WL 4523469, at *6 (S.D.N.Y. Sept. 18, 2019) (quoting *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008)).  Defendants moved the Court to consider the transcript of the April 12, 2021 earnings call as an incorporated-by-reference document in their motion for judicial notice.  Dkt. 71 at 4 (referring to Exhibit 9 as incorporated by reference in the Amended Complaint).  Lead Plaintiffs did not opposed that motion with respect to the April 12, 2021 transcript.  Dkt. 73 at 2, 5.

statement.  In short, Defendants' subsequent statements about supply chain issues or chip supply chain disruptions in the industry generally are insufficient to show that Mr. Zhang's previous statements during the *Decrypt* interview that "the company had secured chips" and had "reduce[d] supply-chain risks" were false statements when made.

Lead Plaintiffs' omissions theory as to Mr. Zhang's *Decrypt* interview statements fails for similar reasons.  To sufficiently plead that these statements were misleading because they omitted material information, Lead Plaintiffs must identify the information that was omitted.  But again, Lead Plaintiffs contend that the omitted information was a "severe supply shortage" of "mining machine" chips affecting Canaan, yet their allegations fail to establish that such a shortage occurred.  In fact, Lead Plaintiffs' omission theory is weaker than their misrepresentation theory because even if the Defendants' April 12, 2021 statements had revealed that Canaan experienced a shortage of chips, they say *nothing* about the extent to which Canaan experienced that shortage. For example, a minor shortage would be consistent with the assertion that Canaan had previously "secured chips" and "reduce[d] supply chain risks."  Without any information regarding the extent of any shortage, Lead Plaintiffs cannot meet the PSLRA's requirement of specifying "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  And while the PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based," *Novak*, 216 F.3d at 313, they are required to plead at least some fact supporting their belief.  Lead Plaintiffs have not done so.

Accordingly, the Court determines that Lead Plaintiffs have failed to adequately allege a false or misleading statement with respect to the April 9, 2021 *Decrypt* article.

2.     **Scienter**

Because the Court concludes that Lead Plaintiffs have alleged a false or misleading statement with respect only to the February 10, 2021 press release, the Court assesses whether Lead Plaintiffs have adequately pleaded scienter with respect to the statements in that press release.

To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). As the Second Circuit has explained:

> Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.
>
> A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* (quotations omitted).

Lead Plaintiffs allege that "each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information." Am. Compl. ¶ 42. In particular, Lead Plaintiffs allege that "[i]n their respective roles as senior officers of Canaan, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period," and that "[n]umerous facts . . . considered collectively, support a strong inference that Defendants knew or, at a minimum, were severely reckless in not

knowing, the true undisclosed facts when they made their false and misleading representations to investors." *Id.* ¶¶ 43-44.[14]

Those "[n]umerous facts" include, first, that Defendants "made detailed statements based on purportedly personal knowledge regarding . . . the Company's sales of bitcoin mining machines," showing that "the Individual Defendants were intently focused on Canaan's bitcoin mining machines . . . and were intimately familiar with the Company's actual performance and sales . . . at the time they made their statements"; second, that the statements "were relayed after quarter end in February . . . 2021" such that "the Individual Defendants knew, or were reckless in not knowing, the previous quarter's financial results and reasons for the results months later"; third, "the magnitude of Canaan's revenue decline in the fourth quarter 2020 makes it simply implausible that the Individual Defendants did not know of the negative financial results and causes of those results during the Class Period"; fourth, "the timing and circumstances of the departure of Canaan's former CFO," Mr. Hong; fifth, that "bitcoin mining machines were the single largest income producing segment for the Company"; and sixth, that Mr. Zhang "founded the Company and not only served as its highest-ranking officer and Chairman of the Board, but he also controlled 69.4% of the voting power as of December 31, 2020." Am. Compl. ¶¶ 45-50.  Lead Plaintiffs further argue that the core operations doctrine provides supplemental support for allegations of scienter in this instance.  *See* Opposition at 22.

The flaw in each of these theories is that they amount to various ways that Defendants must have known specific information at the time of the February 10, 2021 statement.  That specific information consists of Canaan's revenue figures associated with the pre-sales and that those

---

[14] Because Lead Plaintiffs' theory of corporate scienter is predicated on the scienter of Mr. Zhang and Mr. He, *see* Opposition at 24-25; Am. Compl. ¶ 51, the Court does not separately analyze Canaan's scienter.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.").

figures were lower than otherwise achievable because of rising Bitcoin prices during the fourth quarter which Defendants could have taken advantage of had the sale price of the mining machines not been locked in.   Essentially, Lead Plaintiffs say that Defendants must have known this information because of, for example, the timing of the statements, the positions of Mr. Zhang and Mr. He in Canaan, and the magnitude of the impact on revenue.   But Lead Plaintiffs never allege *how* Defendants would have this information, regardless of how important it may have been, and "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."   *Novak*, 216 F.3d at 309; *accord Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 478 F. App'x 679, 682 (2d Cir. 2012) ("[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements 'must specifically identify the reports or statements containing this information.'" (quoting *Novak*, 216 F.3d at 309)).

The Amended Complaint contains no allegation of such a report or statement accessible to Defendants at the time of the February 10, 2021 statement, and instead argues in conclusory fashion that "Canaan's dismal results [were] known to Defendants" because "the fourth quarter and year" were already completed and because the February 10, 2021 statement was made "six weeks after the fourth quarter and full year 2020 ended."   Am. Compl. ¶¶ 31-32.   While there may be an intuitive appeal to the idea that Defendants must have known about fourth quarter of 2020 revenue because they were touting increased revenue visibility, that revenue visibility was explicitly tied to 2021.   *Id.* ¶ 32.   The February 10, 2021 statement did not say that Defendants had increased revenue visibility as to the not-yet-reported financial results of 2020, or that they already had generated revenue figures for 2020.   And while at least some revenue information was likely obtainable within the company related to pre-sale orders, due to the fact that these orders were locked in during late 2020, the Amended Complaint contains no allegations related to how such

information for each sale might have been compiled into some sort of report accessible to Defendants, or even that Mr. He or Mr. Zhang would have been privy to individual sale prices for each of the pre-sales at the time they were made or otherwise before the February 10, 2021 statement, let alone the effects of those sale prices on the company's revenue.  In short, the Amended Complaint does not "specifically identify the reports or statements containing" the revenue information; in essence they allege only that such reports *must have* existed.[15]  Such allegations are insufficient to plead scienter.  *See In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022) ("These allegations amount to little more than speculation that documentation or evidence of internal control deficiencies must have existed and do not specifically identify the reports or statements containing the truthful information, as a plaintiff generally must when contending defendants had access to contrary facts." (internal quotation marks and alterations omitted)).

Nor, with this path foreclosed, do Lead Plaintiffs' other attempts lead to a successful pleading.  It may be true that "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it," *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 Civ. 6637 (FB), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016), but Defendants' February 10, 2021 statements related to their pre-sales indicate only that they were sensitive to how those pre-sales would improve revenue visibility in 2021, not that they necessarily understood how those sales had impacted past revenue in late 2020.  The fact that these statements were made after the fourth quarter concluded also does not raise an inference that revenue information for that quarter was

---

[15] While not finding that any of these allegations necessarily would have been sufficient, the Court notes that Lead Plaintiffs might have alleged, for example, the existence of a sales report showing the funds brought in by pre-sales, a regular practice of reporting preliminary revenue figures within the company shortly after the end of a quarter, or that Mr. Zhang and Mr. He were intimately involved in each individual pre-sale such that they knew the prices and quantities of those sales.

available, especially absent any allegations relating to the company's practices for when it prepares its revenue information for internal review.  *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 38 (S.D.N.Y. 2016) ("[T]hat a quarter has concluded does not mean that the quarter's results have yet been tabulated."); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Co.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss" when allegedly false statement was made three weeks before final sales figures were announced.).

Next, the magnitude of the eventual revenue decline does not raise an inference of scienter both because as discussed there is no indication that Defendants had access to that information at the time of the February 10, 2021 press release and because it is not clear what portion of that decline was due to an increased volume of pre-sales.  This is especially true because Lead Plaintiffs' argument is not that the pre-sales alone caused a loss of revenue, but rather that because the sales prices were locked in, Defendants were unable to take advantage of potentially higher sale prices as the price of Bitcoin, and the accompanying demand for mining machines, rose.  But the magnitude of a revenue decrease from one year to another or from one quarter to another says nothing about the ability of Defendants to understand that they were leaving money on the table either while they were doing it or shortly thereafter.  *See also In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 231 (S.D.N.Y. 2021) ("[T]he magnitude (or duration) of an adverse result does not provide an independent basis for scienter." (internal quotation marks omitted)). The Court therefore determines that the magnitude of the revenue decline in this case does not raise an inference of scienter.

The departure of Canaan's former CFO, Mr. Hong, one day before the February 10, 2021 statement, also does not sufficiently raise an inference of scienter.  "Courts . . . have consistently

held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016) (collecting cases); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (holding that resignations "without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter"). The Amended Complaint alleges only that Mr. Hong "suddenly resigned effective immediately" without explanation and "citing only 'personal reasons,'" Am. Compl. ¶ 30, and then alleges that *The Motley Fool* opined that the February 10, 2021 "financial update is oddly timed" since it immediately followed the CFO's resignation, *id.* ¶ 34. The suggestion appears to be that this "odd[] timing" indicates that Mr. Hong's resignation was related to some corporate misconduct. But the Amended Complaint alleges no other facts related to his departure that suggest that it was related in any way to the February 10, 2021 statements, let alone facts that give rise to an inference of scienter.

Finally, what remains is the "core operations" doctrine. *See* Opposition at 22. "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Renewable Energy Grp.*, 2022 WL 14206678, at *3 n.4 (internal quotation marks omitted). But the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA." *Id.* And so courts in this Circuit generally treat core operations allegations as providing "supplementary but not independently sufficient means to plead scienter." *Cortina v. Anavex Life Sci. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted). Because none of the Lead Plaintiffs' other allegations support an inference of scienter, the core operations doctrine—even if it remains a valid doctrine—cannot save Lead Plaintiffs' claims.

Ultimately the Court must assess, in light of these allegations taken collectively, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. For this Amended Complaint, without any allegation specifically identifying a report or statement containing omitted material facts, the Court concludes that the answer is no. The inference that Defendants had access to fourth quarter of 2020 revenue data related to their pre-sales is not as strong as the inference that Defendants lacked that data a mere six weeks after the close of the quarter. For that reason, the Court determines that Lead Plaintiffs have failed to adequately allege scienter for the February 10, 2021 statement and grants the motion to dismiss on that ground.

Because those are the only statements which the Court finds actionable, the Court dismisses Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims.

## C.     Section 20(a) Claims Against Mr. He and Mr. Zhang

Because the Court has dismissed Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation. *See, e.g., In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations). The Court therefore also dismisses the Section 20(a) claims.

## D.     Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Lead Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor. Opposition at 25. Because the Amended Complaint is the first complaint submitted by Lead Plaintiffs, the Court grants leave to amend. The Court emphasizes that Lead Plaintiffs should only file a Second Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

**IV.  Conclusion**

For the stated reasons, Defendants' motion to dismiss is granted.  The Court grants Lead Plaintiffs leave to amend their Amended Complaint.  In the event Lead Plaintiffs decide to file another amended complaint, they must file it within thirty days of this Opinion and Order.  If Lead Plaintiffs fail to file an amended complaint within thirty days, and do not show good cause to excuse the failure to do so, the Court will dismiss this action with prejudice.  The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 69 and 71.

SO ORDERED.

Dated: March 27, 2023
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

32